```
AO 91
Rev. 11/97
```

**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | FILED - WESTERN DIVISION<br>CLERK, U.S. DISTRICT COURT<br>NOV - 1 2007<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY              DEPUTY | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ALI KHALIL ELREDA, MOHAMAD ELREDA,<br>and SUSANNE ELREDA | DOCKET NO. | |
| | MAGISTRATE'S CASE NO.<br>07-1870M | |

Complaint for violation of Title 18, United States Code, Sections 371, 2320(a) (Conspiracy to Traffic in Counterfeit Goods) and Title 31, United States Code, Section 5324 (Structuring Transactions to Evade a Reporting Requirement)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|
| DATES OF OFFENSES<br>January 26-27, 2007;<br>December 20, 2004 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

<u>Count One</u>: Beginning on or before January 26, 2007, and continuing to on or about January 27, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendants ALI KHALIL ELREDA, MOHAMAD ELREDA, AND SUSANNE ELREDA, and others known and unknown, conspired and agreed with each other to traffic in counterfeit goods in violation of Title 18, United States Code, Section 2320(a).

<u>Count Two</u>: On or about December 20, 2004, in Los Angeles County, within the Central District of California, defendant SUSANNE ELREDA did knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, structure a transaction with a domestic financial institution, to wit, two deposits of $10,000 each into account number xxxxxxx474 at Washington Mutual Bank.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>KRISTEN T. ELLIOTT |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT-FBI |
| Sworn to before me and subscribed in my presence, | |
| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>October 31, 2007 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

BLH:blh          REC: DETENTION (warrant)

IRF

AFFIDAVIT

I, Kristen T. Elliott, being duly sworn, hereby depose and say:

I. **INTRODUCTION**

1. I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed for over five years. I am presently assigned to the FBI, Los Angeles Division, Counterterrorism Squad 4 ("CT-4"). CT-4 is comprised of agents from the FBI, the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS"), Immigration and Customs Enforcement ("ICE") and state and local law enforcement personnel assigned as Task Force Officers ("TFOs"). During this time, I have received training in terrorism-related investigations. I have had experience in investigations involving individuals who are involved in narcotics trafficking, counterfeit clothing, mail fraud, structuring cash deposits and bulk cash smuggling.

2. This affidavit is made in support of a criminal complaint against, and arrest warrants for, ALI KHALIL ELREDA ("ALI ELREDA"), MOHAMAD ELREDA, and SUSANNE ELREDA for violations of 21 U.S.C. §§ 371, 2320 (conspiracy to traffic in counterfeit goods). It also is in support of a criminal complaint against SUSANNE ELREDA for a violation of 31 U.S.C. § 5324 (structuring transactions to evade a reporting requirement).

3. In preparing this affidavit, I have conferred with other federal agents who are experienced in the areas of

structuring cash deposits and counterfeit clothing, including ICE Special Agent Loan McIntosh-Rupp, IRS Special Agent Patrick Caruth, and members of the Los Angeles Police Department and Los Angeles County Sheriff's Department who investigated the sale of counterfeit clothing and related crimes.

4.   I make this affidavit based upon information and evidence provided by witness statements, discussions with other law enforcement officers and agents, reports submitted by other investigative law enforcement officers and agents, telephone calls intercepted pursuant to court-authorized wiretaps, physical evidence collected in the investigation, and my own personal knowledge and experience.  Because this affidavit is being submitted in support of a search warrant, I have not included each and every fact known to me concerning this investigation.

5.   The identities of the suspects in the intercepted calls were ascertained through a variety of methods.  Some of these methods included names used by the speakers themselves during intercepted conversations and surveillance activity, including enforcement activity by local law enforcement agencies, where the drivers of particular vehicles were identified.  The speakers also were identified by subscriber information, surveillance, voice identification by agents and monitors who have compared voices, or by the speakers' own identification of themselves.

6. The intercepted conversations were in English, Arabic, or Spanish. I base my knowledge of the contents of a call on transcripts or summaries prepared by agents or other monitors who listened to the calls; occasionally I have listened to the actual recording of the calls. For calls not in English, I have relied on translations.

7. During the intercepted conversations, many of the participants used cryptic or coded language to discuss narcotics trafficking, sale of counterfeit clothing, money laundering, and other illegal activity over the telephones. Through training, experience, and discussions with other agents, I have determined that many of the terms used describe narcotics trafficking or other illegal activity.

## II. PROBABLE CAUSE THAT CRIMES HAVE OCCURRED

8. Based on my participation in this investigation, I know the following:

   a. The government is investigating the use of clothing stores in the Los Angeles area to facilitate and disguise illegal activities, including drug trafficking, sale of counterfeit clothing, bulk cash smuggling, money laundering, and other crimes.

   b. On September 5, 2002, according to a filing with the California State Board of Equalization, SUSANNE ELREDA was listed as the secretary of Hip Hop Connections Inc., ALI ELREDA

was listed as President, and Ali Abbas Tehfi was listed as Vice-President.

  c. Until recently, ALI ELREDA was one of the owners of a clothing store called HIP HOP CONNECTIONS, and it appears that he still has a connection to the store and works there as an employee. MOHAMAD ELREDA, ALI ELREDA's brother, also has worked at the store.

  d. SUSANNE ELREDA has operated Hip Hop Connections when ALI ELREDA was absent and maintains retail clothing accounts with several clothing companies, including Levi Strauss. Intercepted calls have revealed that SUSANNE ELREDA often watches from the Atlanta, Georgia area, via the Internet, the activity inside and outside of Hip Hop Connections.

  e. As explained below, the ELREDAs and other persons have used the store to further various criminal activities. In particular, they have conspired to sell counterfeit clothing out of the store.

  f. SUSANNE ELREDA also has structured cash deposits into a bank account of MOHAMAD ELREDA of which she is trustee.

A. THE SALE OF COUNTERFEIT CLOTHING

  9. Based on information from a variety of sources, I believe that ALI ELREDA and others have used HIP HOP CONNECTIONS as a site for the sale of counterfeit clothing. These include:

  a. The arrest of ALI ELREDA on November 9, 2004 by

the Los Angeles County Sheriff's Department for selling counterfeit clothing from his clothing store, HIP HOP CONNECTIONS.

      b.    Intercepted call on October 12, 2006 during which ALI ELREDA brokered a deal between a suppler (Eduardo) and a customer (Samir) indicating a price for Nike Air Force One shoes of $25 per pair.  (I know from my training and experience and discussion with other agents that this price strongly indicates the shoes are counterfeit, because these shoes typically retail for over $100 per pair.)

      c.    Undercover purchase of 20 pairs of counterfeit Nike shoes on October 31, 2006 from MOHAMAD ELREDA at HIP HOP CONNECTIONS.

      d.    Intercepted call on January 25, 2006, in which ALI ELREDA asked MOHAMAD ELREDA how the "fake hoodies" were. MOHAMAD ELREDA replied that he had not opened them yet.  ALI ELREDA said he got them for $15 each and MOHAMAD ELREDA agreed that $15 was a good price.  ALI ELREDA told MOHAMAD ELREDA to make room for them in the back of HIP HOP CONNECTIONS.

      e.    The seizure on January 26, 2007, by the Los Angeles County Sheriff's Department of counterfeit clothing from T-Shirt World, a clothing store formerly owned by MOHAMAD ELREDA. Intercepted calls indicated that ALI ELREDA had ordered the seized counterfeit clothing items for MOHAMAD ELREDA and also

indicated that ALI ELREDA still had counterfeit clothing inside HIP HOP CONNECTIONS.  (See following paragraph.)

10.  Based on intercepted calls and my review of reports prepared by other law enforcement officers, I know the following about a seizure of counterfeit clothing that occurred on January 26, 2007:

    a.  On January 26, 2007, Los Angeles County Sheriff's Department ("LASD") deputies executed a state search warrant at T-SHIRT WORLD, a store owned by MOHAMAD ELREDA.  The LASD deputies found approximately $146,000 worth of counterfeit items, including over $72,000 worth of counterfeit Nike brand Air Jordan shoes.

    b.  On January 26, 2007, ALI ELREDA received a call from HIP HOP CONNECTIONS and spoke with Noah, an employee of the store, regarding the search of T-SHIRT WORLD by the LASD for counterfeit goods.  ALI ELREDA told Noah that MOHAMAD ELREDA did not listen and would only keep the boxes in the back, after ALI ELREDA had told MOHAMAD ELREDA to put everything inside the house.  ALI ELREDA also told Noah that MOHAMAD ELREDA had all of the Jordan boxes in the backroom, and ALI ELREDA had already told MOHAMAD ELREDA not to do that.

    c.  Based on my training, experience, and the investigation to date, I believe that ALI ELREDA is explaining to Noah that he told MOHAMAD ELREDA to keep "everything," meaning

the counterfeit items, at MOHAMAD ELREDA's residence in order to evade law enforcement. But MOHAMAD ELREDA did not listen to ELREDA, and he kept the boxes of counterfeit items in the back of his store.

      d. On January 27, 2007, ALI ELREDA placed a call to Abdullah and discussed the search of MOHAMAD ELREDA's business. ELREDA explained to Abdullah that he told MOHAMAD ELREDA to put one color each, leave one box, and put the others at home or in the warehouse, or in the back somewhere, not at the store.

      e. Based on my training, experience, and the investigation to date, I believe that ALI ELREDA is explaining to Abdullah how he puts out only one item of counterfeit clothing and leaves the box at the store. ALI ELREDA further explains to Abdullah that the rest of the counterfeit items are kept at his home or warehouse, but not at the store.

11. ALI ELREDA also spoke with SUSANNE ELREDA about the seizure of the items at T-SHIRT WORLD. SUSANNE ELREDA sometimes said in these calls, in essence, that she was not involved in the sale of the seized items. Nonetheless, her discussions with ALI ELREDA reveal that she was a member of the conspiracy to traffic in counterfeit goods

      a. On January 26, 2007, in a telephone conversation, ALI ELREDA told SUSANNE ELREDA that detectives were in MOHAMAD ELREDA's store for a big load of Jordans, and not for drugs.

SUSANNE ELREDA said that she would call HIP HOP CONNECTIONS to see what was happening.

  c. On January 26, 2007, in a telephone conversation, ALI ELREDA asked SUSANNE ELREDA if they had Evisu jeans in the store, and SUSANNE said no, but that the counterfeit goods that were seized at defendant MOHAMAD ELREDA's store had been shipped to ALI ELREDA.

  d. On January 26, 2007, in a telephone conversation, SUSANNE ELREDA told ALI ELREDA that she had called HIP HOP CONNECTIONS, and that they had counterfeit pants in the store, and he had better get them out. ALI ELREDA told SUSANNE ELREDA that he was going to send someone in a white van.

  e. On January 27, 2007, in a telephone conversation and using coded language, SUSANNE ELREDA asked ALI ELREDA if ALI ELREDA was on his way to clean up whatever counterfeit jeans he had at HIP HOP CONNECTIONS. She told ALI ELREDA to get rid of whatever counterfeit clothing he had at HIP HOP CONNECTIONS.

B. THE STRUCTURING OF FINANCIAL TRANSACTIONS

  12. Based on my training and experience and discussions with IRS Special Agent Patrick Caruth, I know the following:

  a. Financial institutions are required to file a Cash Transaction Report ("CTR") with the United States Department of the Treasury whenever anyone makes a cash deposit over $10,000 in a single calendar day, including multiple deposits that total

more than $10,000. The act of depositing cash under the ceiling limit of $10,000 at different banks or multiple times on the same day, or at the same bank on different days, for the purpose of moving large amounts of currency through financial institutions while avoiding the currency transaction reporting requirement is known as structuring. Title 31 United States Code, Section 5313 and 31 C.F.R. Part 103 of the Bank Secrecy Act (BSA) require any financial institution that engages with a customer in a currency transaction (e.g., a deposit or withdrawal) in excess of $10,000 to report the transaction to the Internal Revenue Service on Form 4789, the CTR. These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are conducted by, or on behalf of, the same person, and they result in either currency received or disbursed by the financial institution totaling more than $10,000 during any one business day.

b. Often individuals involved in illegal activity generate large quantities of cash. Cash by its very nature is fungible. Often individuals involved in illegal activity or underreporting their income will attempt to avoid the filing of CTRs by financial institutions because they do not want law enforcement officials to become aware of cash generated from illegal or unreported activity.

c. Financial institutions are required to report suspicious cash transactions. An example of suspicious cash activity would be depositing $9,900 in cash on a given day or over a series of days. Structured deposits are often even amounts, which are not consistent with typical cash intake for a legitimate business.

13. I have reviewed account documents for Washington Mutual (WAMU) account number 0410-0000635147-4. This account is a savings account that was opened on August 3, 2001, as a custodial account for the benefit of MOHAMMED EL REDA with SUSANNE ELREDA as trustee and signer on the account.

14. Based on a review of the monthly bank statements and deposit slips WAMU account number 0410-0000635147-4, I believe that SUSANNE ELREDA either made or caused to be made, structured cash deposits as follows:

a. During the month of February 2004, SUSANNE ELREDA made four cash deposits of exactly $10,000; one for $9,800; and one for $5,000, for a total of $54,800 in structured cash deposits.

b. During a four-week period from July 2004 through August 2004, SUSANNE ELREDA made 14 cash deposits of exactly $10,000 and one cash deposit of $5,000 for a total of $145,000 in structured cash deposits.

c. During a two-month period from November 2004 through January 2005, SUSANNE ELREDA made 14 cash deposits of exactly $10,000; one for $5,000; and one for $8,470, for a total of $153,470 in structured cash deposits. These deposits include two separate cash deposits of $10,000 each on December 20, 2004.

d. The total amount structured during the eleven-month period from February 2004 through January 2005 in Washington Mutual Account 410000006351474 was $353,270.

## III. SEALING REQUEST

15. At or around the time the arrest warrants requested herein are executed, law enforcement officers will be arresting multiple targets of the government's criminal investigation and executing multiple search warrants at numerous locations within Los Angeles County and elsewhere within the Central District of California. Premature disclosure of the contents of this affidavit could seriously impede the government's efforts to execute the additional arrest and search warrants by providing unarrested targets with information that may result in their attempts to flee or to destroy evidence. Accordingly, I request that the Court issue an order sealing this affidavit until further order of this Court.

## IV. CONCLUSION

16. Based on my training, experience, and consultation with other Special Agents and law enforcement officers, and the above

facts enumerated in this affidavit, I believe there is probable cause to believe that ALI ELREDA, MOHAMAD ELREDA, and SUSANNE ELREDA have violated 21 U.S.C. §§ 371, 2320 (conspiracy to traffic in counterfeit goods).  I also believe that there is probable cause to believe that SUSANNE ELREDA has violated 31 U.S.C. § 5324 (structuring transactions to evade a reporting requirement).

KRISTEN T. ELLIOTT
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN BEFORE ME
THIS _1st_ DAY OF _November_ 2007

HONORABLE VICTOR B. KENTON
United States Magistrate Judge